Max H. Galfunt, J.
The defendants were charged with violating section 353 of the Agriculture and Markets Law, which seeks to prevent overdriving, torturing, and injuring animals.
At the trial the following facts were adduced:
"Mabel,” a horse in harness, is used to pull a hansom cab. On December 30, 1974, defendant Greene, the driver of the cab, was warned by one Inspector Langdon from the A.S.P.C.A. that the horse "Mabel” was limping. Thereupon, the horse was suspended from labor on that day.
Inspector Langdon testified that on the following day, December 31, a check by him revealed that defendant Greene was driving a cab pulled by the horse "Mabel.” The horse still limped. Defendant Greene was subsequently issued a summons and charged with violating section 353 of the Agriculture and Markets Law.
Inspector Stubbs, also from the A.S.P.C.A., testified that on January 10, 1975, he saw defendant Greene driving a hansom cab with the horse "Mabel” pulling said carriage. He further testified that the horse was limping on its left leg. Inspector *177 Stubbs then issued a summons to defendant Greene and defendant O’Rourke, the owner of the horse.
There was testimony that the owner of the stable where the horse "Mabel” was kept, one Goode, had seen the horse limping and advised defendant O’Rourke to obtain the services of a veterinarian for the horse.
Also, testimony was given by one Kevin Mulvey, a driver/ stable hand in Goode’s stable, that he, Mulvey, gave the warning issued by the A.S.P.C.A. to defendant O’Rourke that the horse "Mabel” should be "turned-out” (suspended from labor).
The horse was thoroughly examined by Dr. Goodell, a veterinarian, on January 10, 1975. The doctor testified that he had examined the horse for 45 minutes, and the present problems of the animal had been developed over an extended period of time. The court asked the doctor whether the horse was experiencing pain and the doctor testified that the limping by the horse evidenced pain and that the horse was experiencing pain on December 31, 1974. The horse cannot verbalize his suffering, but the limping does indeed demonstrate that the horse was in pain. His conclusions were that the horse "Mabel” was lame in two legs and that she should be retired from service.
Defendant Greene testified that he had driven the horse on December 31, 1974 and January 10, 1975, but he was told by defendant O’Rourke that a Dr. Davis had examined the horse and found it in good condition. Defendant Greene was thus told by defendant O’Rourke to harness the horse.
Defendant O’Rourke testified that he called one Dr. Davis to examine the horse. Dr. Davis allegedly examined the horse and, as a result of his conversation with Dr. Davis subsequent to the examination, defendant O’Rourke permitted the horse to pull the cab on the occasions in question (Dr. Davis was never called as a witness to testify).
The questions to be decided are then: Are omission and neglect punishable under section 353 of the Agriculture and Markets Law, as are incidents of active cruelty? Does driving a lame horse constitute torture under that section? Is the element of a culpable state of mind necessary for conviction, and if so, have the People demonstrated sufficiently that such state of mind existed here?
Section 353 of the Agriculture and Markets Law, inter alia, *178 states: "A person who overdrives, overloads, tortures or cruelly beats or unjustifiably injures, maims, mutilates or kills any animal, whether wild or tame, and whether belonging to himself or to another, or deprives any animal of necessary sustenance, food or drink, or neglects or refuses to furnish it such sustenance or drink, or causes, procures or permits any animal to be overdriven, overloaded, tortured, cruelly beaten, or unjustifiably injured, maimed, mutilated or killed, or to be deprived of necessary food or drink, or who wilfully sets on foot, instigates, engages in, or in any way furthers any act of cruelty to any animal, or any act tending to produce such cruelty, is guilty of a misdemeanor, punishable by imprisonment for not more than one year, or by a fine of not more than five hundred dollars, or by both.”*
Section 350 defines "torture” or "cruelty” as: "every act, omission, or neglect whereby unjustifiable physical pain, suffering or death is caused or permitted.”
Cruelty to an animal includes every unjustifiable act, omission, or neglect causing pain, suffering, or death which is caused or permitted (Maxwell v State, 50 Ga App 15; New Jersey S.P.C.A. v Board of Educ., 91 NJ Super 81). The test of cruelty is the justifiability of the act or omission (3A CJS, Animals, § 101).
Overdriving or overloading work animals, or working an animal unfit for labor, may constitute cruelty.
The owner or bailee of an animal may be convicted of cruelty to it on evidence that it was worked with his knowledge and consent when it was unfit for labor (People v Brunell, 48 How Prac 435; State v Browning, 70 SC 466).
Would the failure to provide medical care for the horse "Mabel” constitute an omission or neglect under the statute, which may be punished under section 353 of the Agriculture and Markets Law, as an incident of active cruelty? Pursuant to that section, an individual may be punished for neglecting to provide sustenance, food or drink. Sustenance, as defined by Webster’s Third New International Dictionary (1966), is the supplying or being supplied with the necessaries of life. It is the opinion of this court that permitting a horse which is *179 limping to continue to work without supplying necessary medical attention constitutes neglect under the statute.
There seems to be a dearth of cases as to limping horses, but according to the case law, driving a horse which is sick, sore or lame, or otherwise unfit for work may constitute torture which is punishable under section 353 of the Agriculture and Markets Law. Where a defendant charged with a violation of section 185 of the Penal Law of 1909 (the forerunner of section 353 of the Agriculture and Markets Law) had knowledge that a horse was suffering from open sores, yet permitted the. animal to be hired out despite this condition, with consequent torture to the animal, the defendant was properly convicted of cruelty to animals (People v Koogan, 256 App Div 1078; State v Goodall, 90 Ore 485).
The mere act of driving a sick, sore, lame or disabled horse is not, per se, torture intended to be prevented by the statute (Matter of Stage Horse Cases, 15 Abb Prac [NS] 51). The statute is not violated if, where the horse has become lame, disabled or sick on the road, it is driven directly to its stable, driven for exercise or driven in a manner carefully proportioned to its condition. Whether a horse suffering from certain sores or disorders is injured or suffers torture by being driven may be a question to be determined by medical experts. Where drivers are arrested for driving diseased horses, the question arises as to how far such drivers are guilty of any offense if they were ignorant of the condition of the horse or inexpert at discovering signs of suffering. The stagecoach drivers did not select the horses they drove. The court held that they should not be punished, as the offense was committed by parties who knowingly caused them to drive horses unfit for work.
In order to convict a defendant under section 353 of the Agriculture and Markets Law, the defendant must have a culpable state of mind. Although the statute does not contain words requiring culpability, unless there is a clear legislative intent to impose strict liability, a criminal statute should be construed as requiring mental culpability (People v Arcidicono, 75 Misc 2d 294). Nevertheless, it is not necessary to prove that wrongful acts, as defined by this statute, were done maliciously. In People v Brunell (48 How Prac 435), the evidence showed that the horse which was the subject of the alleged cruelty had injured both knees. Defendants knew of the injury but drove the horse anyhow. The court said that *180 there was no evidence to show that the defendants caused the horse to be harnessed and driven maliciously or for the purpose of torturing and giving pain to the animal. However, if the defendants knew about the horse’s condition, and the horse suffered torture or pain when it was driven, they must be presumed to have known that if they caused the horse to be worked it would suffer. The question is whether they willfully caused certain things to be done, i.e., driving the horse, which necessarily tortured it.
In the case at bar, the defendants Greene and O’Rourke knew that the horse "Mabel” was limping. Yet they continued to work the horse in spite of her condition. The defendant Greene was told by the A.S.P.C.A. inspector that the animal should not be worked when she was limping. On the day following the inspector’s warning, Greene was driving the horse again, and she was limping. This case differs from the Stage Horse Cases (supra) because Greene knew that the horse was in poor physical condition.
In People v Arcidicono (supra), the defendant was convicted of neglecting to provide proper food for a horse even though the owner refused to give him enough money to pay for it. It is not sufficient for Greene to say that O’Rourke told him to work the horse. He knew that the horse was in pain but continued to drive her without providing medical attention. However, O’Rourke told him that a veterinarian had examined "Mabel” and that "Mabel” could work. It is clear from the testimony that O’Rourke also knew that "Mabel” was limping and should not have been worked. Despite her condition, he permitted her to work pulling a hansom cab, consequently causing her pain.
The testimony supports the conclusion that the defendants neglected to provide proper medical attention for the horse. An A.S.P.C.A. inspector first noticed that "Mabel” was limping on December 30, 1974. On January 10,1975, the horse was still limping. Dr. Goodell, the veterinarian who examined the animal on January 10, 1975, testified that "Mabel’s” problems had developed over a long period of time. Upon receiving notice of "Mabel’s” lameness, the defendant O’Rourke was obligated to call a veterinarian in order that the horse might receive proper medical attention.
The evidence in the record is sufficient to support the conclusion that the horse was not given proper medical attention to alleviate the pain.
*181 History prior to the middle of the 19th century is devoid of any laws as to cruelty to animals. Only recently has there been codification in our legal system forbidding cruelty to animals. But, the moral obligation of man toward the domestic animal is well documented in the Bible. "A righteous man regardeth the life of his beast” (Proverbs 12:10). He has consideration for its feelings and needs.
The Bible also states that if you see an animal hurt or overburdened, one should not look away but help it. (Deuteronomy 22:4.)
It is truly a humanitarian sentiment that domestic animals are in fact considered part of the human community. Thus, they should be treated with respect and given proper care.
Having heard the testimony, this court concludes that defendant Greene, as an employee, properly relied on the statements of defendant O’Rourke as to the fitness of the horse "Mabel.”
Thus, it is the finding of this court that defendant O’Rourke is guilty of violating section 353 of the Agriculture and Markets Law.

 As a corollary, section 358 of the Agriculture and Markets Law prevents the sale of any horse at public auction if said horse could not be worked in this State without violating the law against cruelty to animals. Debility, disease and lameness are three categories under which a horse may be found unfit for work.